LORELLE B. KNOTTS, RESPONDENT, v. SENTINEL LIFE INSURANCE CO., APPELLANT.—67 S. W. (2d) 798.

Kansas City Court of Appeals. January 8, 1934.

*David N. Taylor* for respondent.

*Chas. M. Howell* and *Wm. H. Allen* for appellant.

SHAIN, P. J.—This action by Lorelle B. Knotts, plaintiff, against the Sentinel Life Insurance Company, a corporation, defendant, is one wherein plaintiff is seeking to recover from the defendant on a contract of insurance on the life of the plaintiff's infant son.

It appears from the evidence that plaintiff issued on the life of children a form of insurance that it designated as a "Guaranteed Saving Bond." The contract being somewhat different from the general line of life insurance contracts, we herein set out the contract, omitting the conditions and privileges which follow the signed contract and are made a part thereof.

The contract reads as follows:

"The Sentinel Life Insurance Company
"Kansas City, Missouri
"(Hereinafter Called the Company)
"AGREES TO PAY.........ONE THOUSAND.........Dollars
"(Face Amount of this Contract)
"to........Lorelle B. Knotts, Father of the Insured, Beneficiary, immediately upon receipt of due proof of the death of........John Thomas Knotts (Hereinafter Called the Purchaser)........, the Insured, during the continuance of this contract.

"If the Purchaser is living and all premiums due hereunder have been paid for the full number of years and provided no coupons have been used he may elect any one of the following options:

"Option 1. A Paid-up Life Contract for $1000.00, at the end of 10....years, and an immediate cash settlement of ........$26.92.

"Option 2. Immediate cash settlement at the end of twenty-five years for........:....................................$1000.00

"Option 3. A Paid-up Life Contract at the end of twenty-five years for ..........:..........................:..................$1000.00 and an immediate cash settlement of ....................:...... $690.27

"Option 4. A Paid-up Life Contract at the end of twenty-five years for.................................................$3235.00 subject to evidence of insurability satisfactory to the Company.

"Option 5. An immediate annual income for ten years certain of ..:....................................................$49.23 continuous thereafter during the lifetime of Purchaser.

"This contract is issued and accepted subject to all conditions and privileges herein described on the following pages hereof, which are hereby made a part of this contract."

The evidence in the case is clearly to the effect that it was the fixed policy of the defendant company in all cases, wherein they issued this class of contract on the life of infants of tender years, to attach an endorsement or rider to the contract limiting liability in case of death of the infant at any time up to and including five years. This rider contained grade death benefits as follows:

"Endorsement

"Graded        Attached to and forming a part of Policy No. ....
"Death         issued by SENTINEL LIFE INSURANCE COM-
"Benefits       PANY, the .... day of....., .. 19.., on the life
               of ........
               "In event of the Insured's death before the an-
               niversary of this policy nearest to his fifth birthday,
               the face amount payable shall be in accordance with
               the following schedule:

"THE SUM INSURED FOR RESPECTIVE POLICY YEARS

| "1st | 2nd | 3rd | 4th | 5th | Subsequent |
|------|------|------|------|------|------------|
| "$50.00 | $200.00 | $400.00 | $600.00 | $800.00 | $1000.00" |

The evidence is to the effect that on May 1, 1931, the defendant for consideration issued a life policy of the kind set forth above on the life of John Thomas Knotts, an infant of tender years and the father of said infant, Lorelle B. Knotts, was designated as beneficiary.

It appears that inadvertently or otherwise the rider or indorsement as to graded death benefits was not attached to the contract when delivered. It is shown that the said infant died on October 29, 1931, while the contract was in full force and effect. Due proof of death is shown to have been made and upon defendant's refusal to pay the face of the policy, $1000, plaintiff brought this suit.

The plaintiff in his petition pleads all necessary allegations requisite to recovery on a $1000 death benefit contract.

The defendant pleads in its answer an admission of executing the policy sued upon and attached to plaintiff's petition, but denies each and every other allegation of plaintiff's petition. The defendant further pleads by way of affirmative relief that, by a mutual mistake of plaintiff and defendant, the rider or endorsement as to graded death benefits had not been attached to the policy as was intended by the parties and asking the court to reform the policy by decreeing that such rider or endorsement be made a part of the contract and for a decree limiting recovery to $50 as provided in said endorsement.

The plaintiff in his reply presents that he intended to, and did purchase a policy in immediate benefit for $1000, denies that there was any mutual agreement or understanding that said endorsement be attached to the policy or should in any manner restrict the benefit in the sum of $1000 as provided by the contract as delivered, that, if there be any mistake, the same was due to the carelessness of defendant, that defendant's agents well knew when the policy was delivered to the plaintiff that no such rider or endorsement was on said policy and that the liability in benefit of $1000 attached upon the delivery of the policy. In further reply plaintiff presents that liability was first denied by defendant on other grounds, that plaintiff had been misled thereby respecting the defense being made and was caused to employ counsel, make proofs of loss and sustain substantial expense by reason of false representations as aforesaid. Plaintiff in reply further pleads laches and estoppel based upon allegations above, and alleges that to now reform the contract, plaintiff will suffer irreparable loss and renews his prayer as set forth in his petition.

The cause was tried by the court as an equity case. No findings of fact or declarations of law are shown to have been asked for or given.

The judgment of the trial court on November 18, 1932, was for plaintiff in the full amount of the policy, $1000 and for six per cent interest from November 27, 1932.

## OPINION.

The defendant in its brief makes four assignments of error. However, under "Points and Authorities," it presents its contentions under two heads that in effect, cover all claims made by it. The points presented are as follows:

"I.

"The court erred in failing and refusing to adjudge and decree a reformation of the policy of insurance in question.

"II.

"The appellant did not waive nor is it estopped to assert its equitable right to a reformation of this policy."

As to defendant's point two, we conclude there is no evidence shown in the case which would justify any court in holding that defendant waived or was estopped to assert equitable right to a reformation of the policy.

Plaintiff's contention that defendant was estopped was based upon allegations and evidence submitted as to the carelessness and negligence of defendant's agents. The evidence discloses that an employee, whose duty it was to check the policies, discovered the mistake before delivery and informed the manager of the office of the fact. It appears from the evidence that by reason of economic conditions existing in 1931, frequent changes of managers occurred and that the then manager has been replaced and his whereabouts unknown, further, that this employee shortly after the discovery went away on a vacation. We conclude that the negligence is not so gross and inexcusable as to cause a court of equity to refuse reformation on the ground of the negligence shown by the evidence herein. [Berry v. Continental Life Insurance Company of Missouri, 33 S. W. (2d) 1016.]

With appellant's point two disposed of in its favor, it becomes our duty as a court of equity to analyze closely the evidence presented and determine as to whether there was such a mutual mistake as a court of equity will be justified to correct.

No other conclusion can be drawn from the evidence other than to the effect, that the absence of the graded death benefits endorsement was due to a mistake on the part of the defendant. The burden, of course, rests upon the defendant to prove that the mistake was mutual. To meet this burden, defendant presents evidence to the effect, that one Hughes at the time the policy in issue was sold and delivered, was in the employ of the N. L. Adams agency of Kansas City, Missouri, as a sales manager; "general agent under the agency." It is disclosed that Hughes had other agents known as subagents working under him and that the plaintiff's father, M. Burley Knotts, was one of the same. It is further disclosed that the N. L. Adams Agency had such a connection with the defendant as authorized the agency to sell insurance for defendant and through this agency that the policy in issue was sold by and through Mr. Hughes and M. Burley Knotts.

The evidence discloses that in November, 1930, Mr. Hughes and Mr. Burley Knotts had sold a "Guaranteed Savings Bond" policy to plaintiff on the life of the plaintiff's infant daughter, which daughter was older than the infant covered by the policy here in issue. It is shown that this first policy contained the graded death benefits endorsement which defendant contends was intended to be embraced in the policy in issue.

Defendant presents that plaintiff was duly informed as to the endorsement in the first policy, was made fully acquainted with the provisions for graded death benefits therein contained, and contends further that plaintiff, with that knowledge, undertook to buy a policy

for his younger child of like nature and with like graded benefits as in the first policy, and, that plaintiff had been informed as to same and that it was mutually understood that he was buying a policy with the same graded benefits endorsement.

Defendant to sustain its contention placed Mr. Hughes on the stand. A great many questions were asked Mr. Hughes and were answered by him concerning the intent as to the endorsement and as to instructions to and the understandings of subagents concerning the graded death benefit rider which do not throw light on the knowledge of plaintiff touching said matters. In the direct testimony of Mr. Hughes, pertinent to the issue herein, this question and answer appears as to the sale of the first policy:

"Q. Just explain to the court what you did say, if anything, to Mr. Lorelle Knotts at the time you described this policy to him? A. I would say that I gave him the rate, what the policy would provide and pay to the insured, the holder of the certificate, should death occur before the bond was matured, over a period of years it was written for; and afterwards what they gave a man, what the amount should be at maturity."

Again,

"Q. What was the benefit on a policy customarily issued by the company, which you were authorized to sell,—what was the benefit for the first year? A. $100 up to the first year; $200 one year, $300 in six, $400 in eight and one-half in five years. That is my memory."

Concerning the sale of the first policy, the witness somewhat qualifies his statement later, so as to leave some question as to whether or not the witness was basing his answers on his general recollection of his usual method, rather than his memory as to what he actually said.

In his testimony the following questions and answers appear:

"Q. What explanation, if any, was made by you as to the graduated schedule of benefits? A. The schedule was compared in this at the time the contract was sold; we quoted the instrument we sold it from and, of course, that is what I quoted; that was evidential by what I collected. I wouldn't quote anything only what I had to quote,—my memory was it was $100. I haven't handled those policies for several months or a year.

"Q. Did you make such explanation to the plaintiff in this case? A. That is my program in looking at the insurance contract we are going to sell.

"Q. Did you ever see the Betty Lorelle Knotts policy? A. Yes; the Betty Lorelle Knotts policy was issued and I gave it to Mr. Knotts."

Concerning the sale of the policy in issue in this case, Mr. Hughes on direct examination testified as follows:

"Q. Did he or not return the insurance policy to you? A. He did.

"Q. What did you do with it? A. Okayed it, indorsed it and sent it upstairs for issuance.

"Q. This policy was issued afterwards by the company and was it delivered to you? A. It was delivered to me first.

"Q. What did you do with it? A. Delivered it to Mr. Burley Knotts.

"Q. Do you know what he did with it? A. Yes; he took it and delivered it to the insured.

"Q. Did you afterwards see that policy; was it afterwards brought back to you? A. Yes; he brought it back.

"Q. When was that? A. According to my memory, probably the next day afterwards.

"Q. Do you know whether it had been delivered to the plaintiff prior to the time it was brought back to you? A. I understand that it hadn't been delivered.

"Q. Then what did you do with the policy? A. After its return?

"Q. Yes. A. Mr. Knotts returned it to me, asked me if the policy was full benefit, and my answer, naturally, would be 'YES.' Anything the company gives out is naturally correct. That is naturally a hard question. I says 'I think not; I think it is a graded schedule.' And I looked at the policy and there was none in it. He says 'What do you say now?' I says 'I still think it is a graded policy but I will find out.' I called upstairs to Miss Johnson, whom I had a great deal of business with—

"Q. (interrupting): Who was Miss Johnson? A. She was absent then and I asked for Miss Lindsey.

"Q. Who is she? A. Also in the office with Miss Johnson at the head of the health and accident department.

"Q. This was health and accident? A. No, sir.

"Q. Did you talk with Miss Lindsey about that? A. Yes, sir.

"Q. What did you do with the policy? A. I asked if the instrument, whether it was correct or not,—if that was right—a full benefit, and was advised from her office, I don't know how, but I was advised the matter would be gone into and looked up and I would be notified.

"Q. What did you do with the policy? A. I sent the policy upstairs; it was later delivered to my desk.

"Q. Did you send the policy upstairs? A. That is my memory.

"Q. Are you sure you did that? A. I am not so sure about that.

"Q. Is it possible you kept that in your desk? A. I am not so positive.

"Q. You know you telephoned upstairs that day? A. Yes, sir.

"Q. Who did you afterwards talk to about it after the telephone call? A. Only Mr. Burley Knotts.

"Q. What did you do with the policy at that time? A. I later gave it to Mr. Knotts for delivery.

"Q. You didn't have anything to do with issuing the policy? A. No, sir.

"Q. Or Adams agency didn't? A. That is my understanding."

On cross-examination Mr. Hughes testified:

"Q. Mr. Hughes, I believe you stated this morning in your direct examination that this policy on John Thomas Knotts, marked plaintiff's Exhibit 'A' brought back to you before the delivery to the insured, the plaintiff, for verification as to its terms? A. That is right.

"Q. And when that was brought back to you and the policy was in the same condition that it is now? A. I would say 'yes.'

"Q. And you advised that it was not full benefit, did you? A. I evidently said the policy was all right but I sent upstairs to find out.

"Q. You advised then that, in your opinion, it was all right? A. That is what I said.

"Q. A full benefit to start out with—that is the way the policy was written? A. Yes, sir.

"Q. No graded schedule in there, was there? A. No; there was none.

"Q. You say you submitted that to the Sentinal Life Insurance Company? A. That is right.

"Q. And verified your decision? A. No; I didn't get an answer to my decision.

"Q. Well, you advised the company as to this policy in its present condition? A. Yes, sir."

To further sustain the issue made, the defendant presented evidence to the effect the company discovered, before loss, that a mistake had been made by leaving off the endorsement, that a letter was sent to the plaintiff explaining the alleged mistake, and that it inclosed in the letter a properly filled endorsement and requested plaintiff to attach same to the policy.

Mr. Burley Knotts, the subagent, was not called as a witness by either side. With this subagent's relation to both the plaintiff and defendant in mind, we conclude, we are not justified in drawing any inference from the failure to produce him as a witness.

To meet the affirmative defense made by defendant is the testimony of the plaintiff.

As to the main issue in this case, we are confined principally to the testimony of Mr. Hughes on one side and the plaintiff on the other. Both witnesses are somewhat indefinite as to what happened in the sale and purchase of the first policy. As to the purchase of the first policy, Mr. Hughes had testified to exhibiting, delivering and explaining to the plaintiff a document, that is claimed, would have explained to the plaintiff the graded death benefit feature. It appears that the negotiations for the second policy were principally with the subagent, Knotts.

In the cross-examination of plaintiff is found the following questions and answers:

"Q. When the first policy was sold to you, they didn't tell you—that is, Mr. Hughes and your father didn't tell you that there would be one thousand dollars payable in event of death within the first five years, did they? A. As I understood them; yes. That was my understanding of the policy I was buying.

"Q. Did they or did they not so tell you? A. I am sorry, that is too long to make a fact statement.

"MR. REED: I think he should answer the question, whether or not they made that statement to him.

"THE COURT: He says he can't say, as I understand him.

"Q. You don't know then, do you? A. No, sir. When I bought the policy my understanding it was worth that from the time I took it.

"Q. Whether they told you that, either one of them, you don't know? A. No, sir; I wouldn't say that they did or they didn't.

"Q. I will hand you document marked defendant's Exhibit 'G' and ask you if at the time your father or Mr. Hughes or both of them talked to you about this policy if they showed you this literature concerning the policy? A. May I ask which policy?

"Q. Either one or the other,—the one on your baby or first policy on your daughter? A. No, sir; they didn't.

"Q. You didn't see that document at all? A. No, sir."

On direct examination plaintiff's testimony touching the purchase of the policy in issue is as follows:

"Q. Did you at any time know anything about a graded schedule referred to being in there in either one of the policies at any time? A. No, sir; I did not know.

"Q. Did you ever know at any time that either one of the policies were not full benefit in case of death? A. No, sir; I could tell after the suit was filed.

"Q. If you had known that this policy in this suit or either of them were not in full benefit upon immediate death, would you have purchased it? A. No, sir; I bought it with the intention of getting one thousand dollars savings bond. That was my idea,—a savings bond, and I thought it was a thousand dollars.

"Q. Well, you would not have been willing to pay thirty-nine or forty dollars for fifty dollars of insurance, would you? A. No, sir.

"Q. I will ask you if at any time after delivery of the policy defendant company ever intimated to you anything about mistake in the policy? A. No, sir."

On cross-examination the plaintiff testified as to the policy in issue as follows:

"Q. Did you ever read this policy? A. No, sir; I looked at it. That was my understanding.

"Q. You didn't examine the policy when it was brought out to you? A. I looked at it; yes, sir.

"Q. Did you read it? A. Not fully; not all of it.

"Q. What part did you read? A. I read the first of it to see if it was made out to my name—right name was on it.

"Q. Looked at it to see if it was made out to you? A. Properly.

"Q. Did you see any difference in this policy and the one on Betty's life? A. I am sorry, I didn't compare them. I wouldn't know,—

"Q. (interrupting): Did you finish your answer? A. I wouldn't notice any specific difference, probably.

"Q. In other words, after looking at it you could not have told then? A. I might 'of' if I had examined it carefully.

"Q. And you didn't examine it carefully? A. No, sir.

"Q. And you didn't compare Betty's policy at that time? A. No, sir.

"Q. Did you send that back to your father to ask if it was in full benefit? A. Yes, sir.

"Q. You discussed whether it was or was not? A. Some other insurance man told me some companies didn't issue them in full benefit. That is why I sent it back.

"Q. Sent Betty's back to see if it was full benefit? A. No, sir, I had been told—

"Q. (interrupting): Did you know whether it was full benefit or not? A. No, sir; my understanding it was.

"Q. You thought it the same kind of policy you got on Betty's. A. I thought I was getting a full guaranteed bond.

"Q. As on Betty's life? A. As I understood it.

"REDIRECT EXAMINATION BY MR. TAYLOR.

"Q. If Betty's was full benefit the same as this one? A. Yes, sir.

"RECROSS EXAMINATION BY MR. REED.

"Q. If you thought this was full benefit, why did you send it back? A. Another insurance man—several had been trying to write on Betty—said some companies didn't write full benefit.

"REDIRECT EXAMINATION BY MR. TAYLOR.

"Q. You sent it back to be sure about it? A. Yes, sir.

"Q. Before you paid it? A. Yes, sir."

Concerning the letter as testified to by Mr. Hughes, plaintiff testified on cross-examination as follows:

"Q. Did you receive a letter from the company under date of July 17, 1931? A. I am sorry, sir; I received several letters. They were usually statements of payments due. I paid very little attention.

"Q. Did you receive a letter from the company after you received the policy inclosing an indorsement,—inclosing a duplicate of the one I am showing you that is attached to defendant's answer in

the case? A. As I said before, I cannot say what I received as I paid very little attention to anything as long as I thought I had my premiums paid up.

"Q. You don't know whether you received such a letter containing such an instrument? A. No, sir.

"Q. And you would not say you didn't? A. I wouldn't say I did or didn't.

"Q. In order to refresh your recollection I hand you a copy of a letter dated July 17, 1931, and ask you to read this copy and see whether that refreshes your recollection as to whether you received the original of that? A. No, sir, I wouldn't swear.

"Q. You don't know? A. No.

"Q. You wouldn't swear you did? A. No, and I wouldn't swear I didn't."

The subject-matter of the questions and answers above set out was gone over repeatedly in direct, redirect, cross and recross examination. When the whole is read and considered, the plaintiff's testimony is substantially to the effect that in the purchase of the second policy he was buying the policy in issue with the intent of buying the same kind that he understood the first to be; but that until after the question was brought up after the death of his younger child, he understood the first policy to be for the full amount of $1000 in case of death of insured child.

Our courts are often confronted with issues arising out of a misunderstanding of the provisions of insurance contracts. This is probably due to the fact that the insured is not required to attest the policy with his signature and accepts delivery of the policy with a somewhat choatic conception of its contents.

Insurance policies as a rule, as appears in this case, present on the front page, in somewhat bold type, an agreement to pay a designated amount on proof of death and wherein is inserted, above the attestation by the president and secretary of the company, a clause to this effect, to-wit:

"This contract is issued and accepted subject to all the conditions and privileges herein described on the following pages hereof, which are made a part of this contract. . . ."

After this follows several pages in less bold type wherein many conditions are set forth. By way of parenthesis we might say, that if a procedure were adopted of placing at the outset and in bold type the *conditions* and *privileges*, it might result in less confusion, although probably at a decrease in the volume of insurance business. Be that as it may, it is the duty of the court to give due credit to every lawful condition of the policy wherever found. However, the condition presented by the defendant herein is admitted not to have been placed upon or in the contract when issued and delivered, and

as before stated, the burden rests upon the defendant to establish mutuality of the mistake.

From a careful study of all the evidence, we conclude that the defendant has not met the burden of establishing a mutual mistake. In reaching this conclusion, we give consideration of the fact that there is testimony offered by defendant which tends to corroborate plaintiff's testimony to the effect, that he took the policy back and refused to accept same unless the full benefit was provided for in the policy.

As the trial court found against plaintiff on the issue of attorney fees and vexatious delay, the issues left herein must be determined by the weight of evidence touching the issue of mutuality of the mistake alleged.

Having reached the conclusion as above stated, no authority need be cited as to our duty to conclude that issue in favor of the plaintiff.

Judgment of the trial court is affirmed. All concur.

### On Motion for Rehearing.

SHAIN, P. J.—The defendant in its motion for rehearing presents that this court has overlooked controlling cases, cited and not cited, also, that we have failed to consider the statutes as to discriminating between its insured.

While the case at bar was tried by the court without a jury and the duty of this court is to sustain the trial court, if for any reason shown in the record the trial court should be sustained, still as the defendant in its motion for a rehearing has cited cases which had been overlooked and not cited by it before submission and as these cases might appear in conflict, if not distinguished, we therefore deem it but fair to the defendant to hand down this opinion on motion for rehearing.

Let us here observe that counsel cannot always presume from an appellate court's opinion that the court has overlooked authority which is cited merely upon the fact that all cases cited are not taken up and commented upon. If appellate courts be required to comment upon and make distinguishments as to all cases cited in briefs, it would result in the handing down of digests and not judicial opinions. The urge to long and argumentative opinions is strong enough without the urge of counsel for detailed opinions.

It is presented that this court has overlooked the opinion in New York Life Insurance Co. v. Gilbert, 215 Mo. App. 201.

In the above case the insured had written requesting the computation of the amount of paid up policy he was entitled to under the contract; the company made a mistake and computed the amount as $768 when the right computation was $296; and the insured instructed the company to place same on paid up basis and the amount of $768 was indorsed thereon. In less than a month the mistake was

discovered and the insured notified and request for correction made. The insured contended for the amount indorsed upon the theory that he would not have made the change if the amount of $296 had been indorsed. Later the insurance company brought its action to correct the mistake.

Judge BLAND of this court wrote the opinion in the above case. In the course of the opinion it is observed that, at the time the mistake was discovered and request for correction made, the same could have been corrected without injury to the insured or the beneficiary or anyone else concerned. This court declared the mistake as mutual on the express grounds stated in the opinion, to-wit: That the insured had not asked for more than he was entitled to on the policy and that the mistake was mutual in that the insured mistakenly supposed that the amount indorsed on the policy was correct.

Defendant cites in support of its motion, Berry v. Continental Life Insurance Company of Missouri, 33 S. W. (2d) 1016.

In the Berry case the court held the mistake mutual in that the mistaken amount appearing at one place in the policy was in conflict with what the insured was entitled to under the provisions of the contract and that by the correction the company was willing to pay all that he was entitled to under the contract.

In the cases cited by the defendant, it appears that the mistakes were held to be mutual in that when the mistakes were corrected the insured received all he was entitled to in the contract as it was written. In other words, the clerical errors or errors of computation were out of harmony with the contract involved.

In the case at bar the policy had been issued and offered to the plaintiff, which he refused to accept for the reason that someone had informed him that some of the companies were issuing policies restricted as to full benefit. The plaintiff testified that he bought the policy with the intention of getting a one thousand dollar savings bond and further testified he thought he was getting a full guaranteed bond. While the defendant cites cases that are to the effect that plaintiff's thought was not controlling for the reason that the understanding of a witness can have no influence in determining the nature of a contract in respect to which he testifies. Elliott v. Sanderson, 16 Mo. 482, still it must be observed here, that the case at bar is distinguished from the above case in that the plaintiff's understanding of the contract he was testifying to and concerning conforms in every respect with the contract as it was issued and delivered to him. But, be that as it may, we conclude that the evidence on the part of plaintiff herein, when taken in connection with the evidence of defendant herein, even based solely upon the evidence transcribed in the original opinion herein, is sufficient to raise the issue of fact that defendant was in the market for full benefit policy with no graded schedule and that he would have refused any other kind. We further

conclude, that plaintiff's mistaken idea as to former policy cannot be concluded against him as applying to the policy herein sued upon so as to constitute the mistake mutual as to the policy here in issue.

As to the application of Section 5729, Revised Statutes 1929, and Cravens v. Insurance Co., 148 Mo. 583, we hold that there is nothing in the statute or the opinion that precluded the defendant company from issuing full benefit contracts as well as graded schedule contracts. It must be observed that the contract as used in this case requires a rider to convert it into a graded schedule contract. We conclude that the record in this case does not disclose the contract sued upon as in conflict with the statute. While the conclusion can be drawn from the evidence that it was defendant's policy to place the rider on policies issued on the life of infants, there is nothing in the law requiring it to do so and if by mistake it fails in the exercise of its usual practice in that respect, it is beyond the power of this court to correct unless mutual mistake is shown.

Defendant urges that the mailing of letter to plaintiff calling attention to the mistake is conclusive on plaintiff and cites McFarland v. United States Mutual Accident Association, 124 Mo. 204. The case cited holds that, the fact that a letter was mailed, duly addressed and stamped is evidence that it was received. The opinion, however, clearly presents that the evidence but goes to the issue of fact.

The evidence of and concerning the letter in the case at bar was before the court who was the trier of fact and by the finding of the fact by the court, we are bound. Such being the case, we deemed it unnecessary to reaffirm so prime a principle in the opinion handed down herein.

As is held in General Refractories Co. v. Howard et al., 44 S. W. (2d) 65, where parties have agreed to accomplish a particular object by instrument and that instrument when executed was insufficient to effectuate intention, then the mistake is mutual.

This court having concluded that the evidence in this case presents an issue of fact as to whether the minds of the contracting parties had met on the question as to whether a guaranteed schedule restricting the face mount of the policy should be attached, that it follows that the finding of the trial court having determined that issue of fact against defendant, we are bound thereby. We conclude, therefore, that the authorities cited in defendant's brief in the first instance and cited in motion for new trial on the question of mutuality of mistake do not apply to the facts in this case for the reasons above given.

The motion for rehearing is denied. All concur.